BEFORE THE JUDICIAL PANEL
ON
MULTIDISTRICT LITIGATION

JUDICIAL PANEL ON
MULTIDISTRICT LITIGATION
FILED

MAY -1 1979

PATRICIA D. HOWARD
CLERK OF THE PANEL

5/1/79

IN RE DATA GENERAL CORPORATION    )   DOCKET NO. 369
ANTITRUST LITIGATION              )

OPINION AND ORDER

BEFORE MURRAY I. GURFEIN, CHAIRMAN, AND EDWIN A. ROBSON,
STANLEY A. WEIGEL, ANDREW A. CAFFREY, ROY W. HARPER, AND
CHARLES R. WEINER, JUDGES OF THE PANEL.

PER CURIAM

This litigation consists of six actions pending in
three districts:  three actions in the Northern District
of California, two actions in the District of New Jersey,
and one action in the Central District of California.  Data
General Corporation (Data General) is a party to each of
the six actions.

One of the actions in New Jersey (the New Jersey antitrust
action) was originally filed in August, 1978, in the District
of Massachusetts and was recently transferred to the
District of New Jersey pursuant to 28 U.S.C. §1404(a).
In this action, Data General is seeking a declaratory judgment
against Ampex Corporation (Ampex).  Data General states
in the complaint that it manufactures minicomputers and
microcomputers that are smaller and less expensive forms
of general purpose digital computers.  Data General markets
a line of these small computers under the trademark "NOVA",

along with related peripheral devices and related system software.[1/]  Data General further states that for a NOVA to function as a general purpose digital computer, it must consist of a central processing unit (CPU), main memory (or primary storage),[2/] power supply, chassis and operating system software.  Data General asserts that the CPU, main memory and operating system software constitute a single product which is commonly referred to as a computer.

Data General seeks a determination in the New Jersey antitrust action whether: 1) Data General's sale of NOVA minicomputers consisting of a CPU and a minimum amount of main memory constitutes an unlawful tying arrangement in violation o the federal antitrust laws; 2) Data General's licensing practices with respect to NOVA software, including Data General's policy of imposing little or no charge for its software license when a minimum amount of Data General computer equipment is purchased and Data General's policy prohibiting use of the licensed software on non-Data General products, constitute an illegal tying arrangement in violation of the federal antitrust laws; 3) Data General's marketing

---

1/   Data General states in its complaint that its software is specially designed as a fundamental set of instructions basic to the operation of Data General's computer for any practical application.

2/   Data General explains in its complaint that main memory (which consists of one or more memory boards composed of electromagnetic and/or electronic components mounted on a printed circuit) stores the operating system, as well as the application programs and data actually being processed by the CPU, during the data processing cycle.

and licensing practices have created, in violation of the federal antitrust laws, an unreasonable restraint of trade in the sale of memory boards and other computer products; and 4) Data General made false and misleading statements about Ampex's financial soundness and integrity to potential purchasers of Ampex's products.

The other New Jersey action (the New Jersey trade secrets action), filed in March, 1977, was also brought by Data General against Ampex.  Data General alleges that Ampex has wrongfully used Data General's memory unit trade secrets which Data General had disclosed to Ampex in order to allow Ampex to manufacture memory units for Data General.  More specifically, Data General charges that Ampex unlawfully disclosed the subject matter of Data General's trade secrets to a third party competitor of Data General for the purpose of allowing Ampex and the third party competitor to compete unfairly with Data General.

The first of the three actions in the Northern District of California was brought in June, 1978, by Digidyne Corporation (Digidyne) against Data General, Data General's president and various unnamed defendants.  Digidyne alleges that Data General maliciously and slanderously stated to Ampex and other Digidyne customers that Digidyne had used trade secrets and proprietary information of Data General in connection with the design and manufacture of a Digidyne computer.

Digidyne subsequently amended its complaint to allege that:
1) Data General had illegally tied purchase of its software
with purchase of a CPU in violation of the federal antitrust
laws; and 2) Data General had attempted to monopolize the
business of manufacturing NOVA-compatible computers by means
of abuse of copyright laws and licensing agreements and
by threats of lawsuits to potential purchasers of NOVA-
compatible computers.

The second action in the Northern District of California
was filed by SCI Systems, Inc. (SCI) against Data General
in October, 1978.  SCI claims that Data General's practice
of licensing its software only for use with NOVA computers,
and Data General's alleged practice of intentionally designing
and marketing NOVA computers and NOVA software in such a manner
that it is technologically and financially impracticable
for Data General's customers to design their own software,
constitute unlawful tying arrangements in violation of the
federal antitrust laws.  SCI also alleges that Data General
has engaged in a systematic program of harassing manufacturers
of NOVA-compatible computers for the purpose of restraining
competition by bringing groundless actions against other
manufacturers, including SCI, for misappropriating trade
secrets and for breaching and inducing breach of Data General
licenses.  Finally, SCI charges that Data General, in acquiring
the assets of another computer manufacturer, has monopolized or
attempted to monopolize the NOVA-compatible computer market.

The third Northern District of California action was
filed by Fairchild Camera and Instrument Corporation (Fairchild)
against Data General in October, 1978. Fairchild alleges
that Data General's software licensing agreements constitute
illegal tying arrangements under the federal antitrust laws,
and that Data General has attempted to eliminate competition
from Fairchild and other manufacturers in the market for
NOVA-compatible computers by means of abuse of copyright
laws and licensing agreements and by litigation and threats
of litigation to manufacturers of NOVA-compatible computers
and to the manufacturers' potential customers.

The three Northern District of California actions have
been consolidated by the district court for the purpose
of pretrial discovery proceedings.

The Central District of California action was brought
in October, 1978, by Bytronix Corporation (Bytronix) against
Data General. Bytronix alleges that 1) Data General has
restrained competition in the market for minicomputer CPU's
by asserting that manufacturers of NOVA-compatible CPU's
are violating Data General's trade secrets; 2) Data General's
software licensing agreements constitute illegal tying arrange-
ments under the federal antitrust laws; 3) Data General's
marketing policies and practices have unreasonably restrained
trade in the sale of CPU's; and 4) Data General is violating
the California Business and Professions Code by greatly
reducing the price of Data General's licenses to purchasers

of its other equipment and by providing less than adequate
service to equipment Data General sells if that equipment
is used in connection with equipment sold by Data General's
competitors.

Pursuant to 28 U.S.C. §1407, Data General moves the
Panel to transfer the four California actions[3] and the
New Jersey antitrust action to the District of Massachusetts
for coordinated or consolidated pretrial proceedings.
Bytronix, SCI and Fairchild do not oppose centralization
under Section 1407, but they do oppose selection of the
District of Massachusetts as the transferee forum.  SCI
and Fairchild support selection of the Northern District
of California as the transferee forum, and Bytronix favors
either that district or the Central District of California.
Ampex and Digidyne oppose transfer.  If the Panel orders
centralization under Section 1407, however, Ampex and
Digidyne both support selection of the Northern District
of California as the transferee forum.  Also, in the
event of transfer, Ampex favors inclusion of the New Jersey
trade secrets action in the Section 1407 proceedings.[4]
Data General opposes inclusion of that action.

3/ Although there was some ambiguity in Data General's motion
as to whether the non-antitrust claims in the Digidyne action
in the Northern District of California were included in
the motion, that ambiguity becomes academic in light of
our decision to centralize the actions in this docket in
that district and the attendant reality that those claims
will be pending before the transferee court in any event.

4/ We have considered the New Jersey trade secrets action
for inclusion in our present transfer order because all
parties in that action have presented written and oral
argument on whether that action should be included in our
transfer order.  Thus, the requirements of Rule 13(b),
R.P.J.P.M.L.. 78 F.R.D. 561, 571 (1978), have been satisfied.

-7-

We find that these six actions raise common questions of fact and that transfer under Section 1407 to the Northern District of California will best serve the convenience of the parties and witnesses and promote the just and efficient conduct of the litigation.

Ampex and Digidyne deny that the four California actions and the two New Jersey actions share any common questions of fact that are sufficiently complex or time-consuming to warrant transfer under Section 1407.  These opponents argue that the products, technology and market at issue in the California actions involve CPU's and are different from the products, technology and market in the New Jersey actions, which primarily involve memory units.  These opponents urge that voluntary cooperation among the parties, counsel and courts is preferable to transfer under Section 1407.  Data General maintains that the New Jersey trade secrets action involves factual questions which are distinct from those in the other actions in this docket, and that therefore the New Jersey trade secrets action should be excluded from any centralized pretrial proceedings ordered by the Panel.

We are unpersuaded by these contentions.  The California actions and the New Jersey antitrust action all share questions of fact concerning the following: Data General's marketing of the computer equipment Data General manufactures, including Data General's licensing of software Data General has developed; the computer market; Data General's economic

power in the computer market; and whether Data General's
marketing and licensing practices have unreasonably restrained
trade in the sale of computers.  This commonality of factual
questions springs from the reality that Ampex, Bytronix,
Digidyne, Fairchild and SCI all market Data General compatible
devices which depend for their success upon their ability
to function technologically with Data General equipment
at an economically competitive price.  Any difference in
the particular product involved in each action does not
negate this commonality.  Transfer under Section 1407 is
thus necessary in order to prevent duplication of discovery,
avoid inconsistent pretrial rulings, and  economize judicial
effort.  See, e.g., In re IBM Peripheral EDP Devices Antitrust
Litigation, 394 F.Supp. 796, 797 (J.P.M.L. 1975).

    We find that the New Jersey trade secrets action should
also be included in the centralized pretrial proceedings
in this docket.  An understanding of complicated principles
of computer technology will be necessary in both the trade
secrets action and the antitrust actions.  Furthermore,
the type of conduct evidenced by Data General in asserting
its trade secrets claim in the New Jersey action is itself
at issue in several of the antitrust actions wherein plain-
tiffs are asserting that Data General's litigative strategy
is an element of a general scheme of illegal anticompetitive
activity.  The validity of Data General's trade secret claims
may therefore be litigated in the antitrust actions and
the trade secrets actions, and transfer under Section 1407

will help to avoid the duplicative discovery, inconsistent
pretrial rulings, and waste of judicial effort which otherwise
might occur.  Of course, the degree of coordination between
the antitrust actions and the trade secrets action is left
to the discretion of the transferee judge.  And any discovery
unique to a particular action can be scheduled by the trans-
feree judge to proceed concurrently with the common discovery,
thereby permitting the litigation to proceed expeditiously
in all areas.  See In re Swine Flu Immunization Products
Liability Litigation, 446 F. Supp. 244, 247 (J.P.M.L. 1978).

Moreover, while voluntary cooperation among parties
and counsel is always commendable, the record before us
demonstrates that such cooperation can best be achieved
by placing the actions in this docket under the supervision
of a single judge.

Data General urges that the District of Massachusetts
be selected as the transferee forum for this litigation
because relevant documents and witnesses, pertaining to
discovery of both technical and business matters at issue
in these actions, will be found at Data General's headquarters
and research facilities located in that district.

On balance, we find that the Northern District of
California is the preferable transferee forum.  Three of
the six actions in this docket are already pending there,
whereas none is pending in the District of Massachusetts.
More importantly, the Honorable William H. Orrick, Jr., to
whom those three actions are presently assigned, has had

an opportunity to become familiar with the legal and technical questions in this litigation, and is therefore in the best position to supervise the pretrial proceedings in this litigation to their just and expeditious termination. See In re Griseofulvin Antitrust Litigation, 395 F. Supp. 1402, 1403 (J.P.M.L. 1975). We note also that the Northern District of California is the choice of five of the six parties to this litigation. See In re Sugar Industry Antitrust Litigation, 395 F. Supp. 1271, 1274 (J.P.M.L. 1975).

IT IS THEREFORE ORDERED that, pursuant to 28 U.S.C. §1407, all actions listed on the following Schedule A and pending in districts other than the Northern District of California be, and the same hereby are, transferred to that district and, with the consent of that court, assigned to the Honorable William H. Orrick, Jr., for coordinated or consolidated pretrial proceedings with the actions listed on Schedule A and pending there.

SCHEDULE A                              MDL-369

### CENTRAL DISTRICT OF CALIFORNIA

Bytronix Corp. v. Data General Corp.          Civil Action
                                              No. 78-3832-RF(Px)

### NORTHERN DISTRICT OF CALIFORNIA

Digidyne Corp. v. Data General Corp.          Civil Action
                                              No. C-78-1261-WHO

SCI Systems, Inc. v. Data General Corp.       Civil Action
                                              No. C-78-2417-WHO

Fairchild Camera and Instrument Corp.         Civil Action
v. Data General Corp.                         No. C-78-2418-WHO

### DISTRICT OF NEW JERSEY

Data General Corp. v. Ampex Corp.             Civil Action
                                              No. 77-0636

Data General Corp. v. Ampex Corp.             Civil Action
                                              No. 79-1247

BEFORE THE JUDICIAL PANEL
ON
MULTIDISTRICT LITIGATION

JUDICIAL PANEL ON
MULTIDISTRICT LITIGATION
FILED

NOV -9 1979

PATRICIA D. HOWARD
CLERK OF THE PANEL

11/9/79

| | |
|---|---|
| IN RE DATA GENERAL CORPORATION ANTITRUST) LITIGATION ) | |
| ) | |
| Data General Corporation v. Ampex ) | |
| Corporation, N.D. Calif., C.A. No. ) | |
| C79-1002-WHO (D. N.J., C.A. No. ) | |
| 77-0036) ) | |
| Data General Corporation v. Data ) | DOCKET NO. 369 |
| National Corporation, D. Mass., C.A. ) | |
| No. 78-2869-K ) | |
| Data General Corporation v. Ampex ) | |
| Corporation, et al., D. Mass., C.A. ) | |
| No. 79-193-T ) | |
| Data General Corporation v. Ampex ) | |
| Corporation, et al., C.D. Calif., ) | |
| C.A. No. CV79-1342-MRP ) | |

OPINION AND ORDER

BEFORE MURRAY I. GURFEIN, CHAIRMAN, AND ANDREW A. CAFFREY,*
ROY W. HARPER, CHARLES R. WEINER, EDWARD S. NORTHROP, AND
ROBERT H. SCHNACKE, JUDGES OF THE PANEL.

PER CURIAM

I.   BACKGROUND

A.  Prior Proceedings in This Docket

In May, 1979, the Panel, pursuant to 28 U.S.C. §1407,

centralized six actions in this docket in the Northern District

of California for coordinated or consolidated pretrial pro-

ceedings before the Honorable William H. Orrick, Jr.  In

re Data General Corporation Antitrust Litigation, 470 F.

Supp. 855 (J.P.M.L. 1979).

Two of these six actions in the transferee district

are brought by Data General Corporation (Data General) against

---

*     Judge Caffrey took no part in the decision of this
matter.

Ampex Corporation (Ampex).  In one of these actions, Data
General is seeking a declaratory judgment against Ampex.
Data General states in its complaint that it manufactures
minicomputers and microcomputers that are smaller and less
expensive forms of general purpose digital computers.  Data
General markets a line of these small computers under the
trademark "NOVA", along with related peripheral devices and
related system software.[1/]  Data General further states that
for a NOVA to function as a general purpose digital computer,
it must consist of a central processing unit (CPU), main
memory (or primary storage),[2/] power supply, chassis and oper-
ating system software.  Data General asserts that the CPU,
main memory and operating system software constitute a single
product which is commonly referred to as a computer.

Data General seeks a determination in this first action
whether: 1) Data General's sale of NOVA minicomputers consisting
of a CPU and a minimum amount of main memory constitutes
an unlawful tying arrangement in violation of the federal
antitrust laws; 2) Data General's licensing practices with
respect to NOVA software, including Data General's policy
of imposing little or no charge for its software license
when a certain minimum amount of Data General computer equipment

---

[1/]    Data General states in its complaint that its software
is specially designed as a fundamental set of instructions
basic to the operation of Data General's computer for any
practical application.

[2/]    Data General explains in its complaint that main memory
(which consists of one or more memory boards composed of
electromagnetic and/or electronic components mounted on a
printed circuit) stores the operating system, as well as
the application programs and data actually being processed
by the CPU, during the data processing cycle.

is purchased and Data General's policy prohibiting use of the licensed software on non-Data General products, constitute an illegal tying arrangement in violation of the federal antitrust laws; 3) Data General's marketing and licensing practices have created, in violation of the federal antitrust laws, an unreasonable restraint of trade in the sale of memory boards and other computer products; and 4) Data General made false and misleading statements about Ampex's financial soundness and integrity to potential purchasers of Ampex's products.

The second action in the transferee district involving Data General and Ampex as parties was also brought by Data General. Data General alleges that Ampex has wrongfully used Data General's memory unit trade secrets which Data General had disclosed to Ampex in order to allow Ampex to manufacture memory units for Data General. More specifically, Data General charges that Ampex unlawfully disclosed the subject matter of Data General's trade secrets to a third party competitor of Data General for the purpose of allowing Ampex and the third party competitor to compete unfairly with Data General. This action (the trade secrets action) is also the first-captioned action on today's opinion and is the action which is the subject of Data General's motion for remand pursuant to 28 U.S.C. §1407. See infra at 9.

The remaining four actions that were subjects of the Panel's May, 1979 opinion were originally filed in either the Central or Northern District of California (the California actions), and each names Data General as a defendant.

The first of these actions was brought by Digidyne Corporation (Digidyne) against Data General, Data General's president and various unnamed defendants. Digidyne alleges that Data General maliciously and slanderously told Ampex and other Digidyne customers that Digidyne had used trade secrets and proprietary information of Data General in connection with the design and manufacture of a Digidyne computer. Digidyne subsequently amended its complaint to allege that: 1) Data General had illegally tied purchase of its software with purchase of a CPU in violation of the federal antitrust laws; and 2) Data General had attempted to monopolize the business of manufacturing NOVA-compatible computers by means of abuse of copyright laws and licensing agreements and by threats of lawsuits to potential purchasers of NOVA-compatible computers.

The second California action was filed by SCI Systems, Inc. (SCI) against Data General. SCI claims that Data General's practice of licensing its software only for use with NOVA computers, and Data General's practice of intentionally designing and marketing NOVA computers and NOVA software in such manner that it is technologically and financially impracticable for Data General's customers to design their own software, constitute tying arrangements in violation of the federal antitrust laws. SCI also alleges that Data General has engaged in a systematic program of harassing manufacturers of NOVA-compatible computers for the purpose of restraining competition by bringing groundless actions against other manufacturers, including SCI, for misappropriating

trade secrets and breaching and inducing breach of Data General licenses.  Finally, SCI charges that Data General, in acquiring the assets of another computer manufacturer, has monopolized or attempted to monopolize the NOVA-compatible computer market.

The third California action was filed by Fairchild Camera and Instrument Corporation (Fairchild) against Data General.  Fairchild alleges that Data General's software licensing agreements constitute illegal tying arrangements under the federal antitrust laws, and that Data General has attempted to eliminate competition from Fairchild and other manufacturers in the market for NOVA-compatible computers by means of abuse of copyright laws and licensing agreements and by litigation and threats of litigation to manufacturers of NOVA-compatible computers and their potential customers.[3]

The fourth California action was brought by Bytronix Corporation (Bytronix) against Data General.  Bytronix alleges that 1) Data General has restrained competition in the market for minicomputer CPUs by asserting that manufacturers of NOVA-compatible CPUs are violating Data General's trade secrets; 2) Data General's software licensing agreements constitute illegal tying arrangements under the federal anti-trust laws; 3) Data General's marketing policies and practices have unreasonably restrained trade in the sale of CPUs; and 4) Data General is violating the California Business

---

[3]     Subsequent to centralization of the Fairchild and SCI actions by the Panel, Data General filed counterclaims against Fairchild and SCI alleging misappropriation of trade secrets in connection with the development by Fairchild and SCI of CPUs that were said to be compatible with Data General's NOVA computers.

and Professions Code by greatly reducing the price of its
software licenses to purchasers of its other equipment and
by providing less than adequate service of equipment Data
General sells if that equipment is used in connection with
equipment sold by Data General's competitors.

Subsequent to the Panel's May, 1979 opinion, a seventh
action, brought by Data Compass Corporation (Data Compass)
against Data General, was transferred to the Northern District
of California pursuant to a conditional transfer order entered
by the Panel that became final on June 8, 1979.  Data Compass
alleges that Data General engaged in illegal tying arrangements
and that Data General breached a computer purchase contract
between the parties.

Judge Orrick has adopted a bifurcated approach to the
actions before him in the transferee district.  Discovery
and trial have been scheduled to occur first on the antitrust
tie-in issues present in the actions, to be followed by dis-
covery and trial of the remaining issues.

B.  Description of Actions Outside of the Transferee
    District

The second above-captioned action (Data National) was
filed in the District of Massachusetts by Data General against
Data National Corporation (Data National).  Data General
in its complaint states that it sells its products to two
kinds of purchasers:  Original Equipment Manufacturers (OEMs)

and Endusers.[4/]   Data General also states that OEMs receive

discounts from Data General that are ten percent greater

than discounts granted to Endusers.   Data General alleges

that Data National 1) failed to pay invoices when due; 2)

forfeited discounts based on Data National's representations

that it was an OEM and would purchase a certain minimum quantity

of Data General products; 3) failed to pay previously agreed

upon cancellation charges imposed upon the cancellation of

purchase orders submitted to Data General by Data National;

4) failed to pay for certain field engineering services rendered

by Data General; 5) falsely and fraudulently represented

to Data General that Data National was in compliance with

Data General's OEM certifications in order to induce Data

General to enter into an OEM agreement with Data National;

and 6) committed unfair trade practices by falsely representing

and continuing to represent to third parties that Data National

was a Data General OEM.

   In Data National's counterclaim, Data National alleges

that Data General breached its sales contract with Data National

and that Data General induced Data National's customers to

breach their contracts with Data National.   Data National

also alleges that Data General violated federal antitrust

---

4/    Data General explains that an OEM is an intermediate
purchaser who purchases Data General's equipment for resale
after incorporating the equipment into a system which includes
substantial hardware and/or software developed or manufactured
by the purchaser and which represents a significant enhancement
and transformation of the equipment purchased from Data Gen-
eral, both as to value and function.   An Enduser is any
purchaser other than an OEM.

laws by 1) requiring, in restraint of trade, the addition
of substantial hardware and/or software developed or manu-
factured by Data National before Data National would be allowed
to sell Data General's equipment; 2) forcing Data National
and others to sell Data General's equipment at prices specified
by Data General; 3) engaging in price discrimination among
purchasers; and 4) attempting to monopolize the sale of all
of Data  General's equipment "which is only furnished to
[Data National] and others pursuant to agreements whereby
the buyer is forced to certify that it will enhance [Data
General's] equipment by the addition of other substantial
equipment before sale."

The third above-captioned action (Ampex I) was filed
in the District of Massachusetts by Data General against
Data National and Ampex.  Data General alleges that Ampex
and Data National are infringing United States Letters Patent
No. 4,014,006 entitled "Data Processing System Having a Unique
CPU and Memory Timing Relationship and Data Path Configuration."
Ampex is alleged to have made and used, and to have induced
others to make, sell and use, data processing systems, includ-
ing memory devices, which embody the invention of Patent
No. 4,014,006.  Data General also alleges that Ampex, alone,
has 1) wrongfully misappropriated Data General's proprietary
information; 2) unfairly competed with Data General; 3)
breached Ampex's contract with Data General; 4) infringed
upon Data General's common law copyrights; 5) been unjustly
enriched at Data General's expense; and 6) engaged in deliberate
and wilful tortious conduct.

The fourth above-captioned action (Ampex II) is brought
by Ampex and Data National against Data General and Concept
Development, Inc. (CDI) in the Central District of California.
Plaintiffs allege that Ampex entered into a contract with
CDI whereby CDI promised to design and deliver a memory unit
that would operate compatibly with Data General's NOVA 2
CPU, and that CDI agreed to indemnify Ampex against all claims
of interest by third parties in or to the designs furnished
by CDI to Ampex.  Plaintiffs further allege that Ampex sold
one memory unit to Data National incorporating the CDI designs,
which is currently the subject of litigation in Ampex I.
Plaintiffs seek a declaration that Letters Patent No. 4,014,006
is void or not infringed by them and a further declaration
that Ampex has not engaged in the illegal conduct alleged
by Data General in Ampex I.  Plaintiffs also seek indemnifi-
cation from CDI for any wrongful conduct that plaintiffs
may be adjudged to have committed.

II.  PROCEEDINGS BEFORE THE PANEL

Because Data National, Ampex I and Ampex II appeared
to involve common questions of fact with the actions in this
docket previously transferred to the Northern District of
California, the Panel, pursuant to 28 U.S.C. §1407 and Rule
9, R.P.J.P.M.L., 78 F.R.D. 561, 567-68 (1978), entered an
order conditionally transferring the three actions to the
Northern District of California for inclusion in the coordinated
or consolidated pretrial proceedings occurring there.  Data
National and Ampex support transfer.  Data General opposes
transfer.

Data General moves the Panel, pursuant to 28 U.S.C. §1407, for an order remanding the trade secrets action to its transferor district.  Ampex opposes remand at this time.

III.  HOLDING

We find that Data National, Ampex I and Ampex II share questions of fact with the previously transferred actions and that transfer of the three actions to the Northern District of California pursuant to Section 1407 will best serve the convenience of the parties and witnesses and promote the just and efficient conduct of the litigation.  We further find that remand of the trade secrets action is not appropriate at this time.

IV.  REASONING

A.  Ampex I, Ampex II, and the Trade Secrets Action

Although Data General concedes that these three actions share questions of fact regarding computer technology with all actions in the transferee district, Data General contends that, as a result of Judge Orrick's rulings that the antitrust tie-in claims in the actions in the transferee district will proceed through discovery and trial independent of trade secret and other claims, the benefits, if any, of transfer of Ampex I and Ampex II to the transferee district and retention of the trade secrets action there would be minimal and the resulting delay and prejudice to Data General would be great. Data General asserts that Ampex's support for transfer of Ampex I and Ampex II and Ampex's opposition to remand of the trade secrets action evidences Ampex's intention to engage in forum shopping and to bring all proceedings involving

claims of Data General to a standstill.

Data General further urges that Ampex I and Ampex II, involving a specific patent, specific conduct of Ampex and CDI, and specific memory devices not manufactured by Data General, will have little in common with the discovery presently being conducted in the transferee district that has gone into entire markets, entire computer systems and entire product lines, and that has focused completely on antitrust, rather than patent, issues. Data General also contends that the remaining discovery in the trade secrets action is likewise substantially unrelated to the antitrust discovery occurring in the transferee district.

We find these arguments unpersuasive. Data General, itself, has in pleadings before the transferee court delineated the following relationships between the trade secret claims and the antitrust tie-in claims pending there:

> The trade secret issues here involve theft of complex designs and intellectual property in a highly sophisticated industry where physical dissimilarities between the original and copied product make it difficult to prove or disprove a theft case simply by looking at the two items. Among other things, proof of trade secret claims here will involve the technology of the hardware-software interface, the time taken to develop a particular product, the extent to which "glitches" or failures in the original and copied hardware arise under similar operational circumstances, and so forth. As explained below, these technology issues also arise in the tie-in case. We submit that the court's analysis of the relationship between the tie issues and the trade secret issues will be helped by considering the problem as one of the relationship between the tie issues and technology issues.

Memorandum of Data General Corporation In Opposition to Plaintiffs' Motion for Entry of a Pretrial Order Limiting the November Trial and Staying Discovery at 3. (emphasis in

original).  We stress that Data General was discussing not
only its claims against Ampex in the trade secrets action,
but also Data General's counterclaims alleging misappropriation
of trade secrets against plaintiffs in two other actions
in the transferee district.

At oral argument before the Panel, Ampex went to great
lengths to cogently demonstrate to the Panel that the same
complex computer technology involved in the actions now in
the transferee district also provides the underpinning for
Ampex I and Ampex II, regardless of the fact that these two
actions involve legal theories not yet present in the trans-
feree district.  In particular, Ampex has persuaded us that
the actions in the transferee district and Ampex I and Ampex
II all involve intertwined factual questions relating to
prior art and development of the same computer technology
and how that technology pertains to Data General's marketing
practices.

Thus, transfer of Ampex I and Ampex II and retention
of the trade secrets action in the transferee district will
contribute to the expeditious resolution of the related anti-
trust and proprietary right claims involving Data General's
minicomputer products by placing the entire controversy before
a single judge conversant with the complex computer technology
underlying the claims in all actions and by fostering orderly
pretrial proceedings on those common issues.

The adoption of a bifurcated pretrial schedule by Judge
Orrick does nothing to render the continued centralization

of all actions before Judge Orrick inappropriate.[5/]  As we
noted in our original opinion in this litigation, and have
repeatedly emphasized throughout the Panel's history, Section
1407 contemplates that the degree and manner of coordinated
or consolidated pretrial proceedings is left entirely to
the discretion of the trial judge.  See, e.g., In re Data
General Corporation Antitrust Litigation, supra, 470 F. Supp.
at 859; In re Equity Funding Corporation of America Securities
Litigation, 375 F. Supp. 1378, 1384 (J.P.M.L. 1974).  The
transferee judge, as the firsthand judicial observer, is
obviously in the best position to determine the desirability
of a bifurcated method of pretrial proceedings.  We note
that, as Data General admits, the bifurcated proceedings
in the transferee district will not result in a halt to all
relevant proceedings with respect to trade secret claims,
for technological discovery that is undertaken on the antitrust
tie-in claims and that is also related to the trade secret
claims will, perforce, be occurring concurrently.  This rea-
soning similarly applies to Ampex I and Ampex II.

   Furthermore, we note that Data General has already
requested Judge Orrick to recommend to the Panel remand of
the trade secrets action, and Judge Orrick, in a ruling from
the bench on July 18, 1979, has denied that request.  The
following quotation from an earlier Panel opinion is apposite

---

5/    For a discussion on the use of separate trials of sep-
arate issues as a means of securing a more orderly presentation
of evidence or a better understanding of the evidence in
relation to the particular issue or issues under consideration
by the trier of fact, see Manual for Complex Litigation,
Part I, §4.12 (rev. ed. 1977).

to the proceedings before us:

> In considering the question of remand, the Panel has
> consistently given great weight to the transferee judge's
> determination that remand of a particular action at
> a particular time is appropriate because the transferee
> judge, after all, supervises the day-to-day pretrial
> proceedings.  See, e.g., In re IBM Peripheral EDP Devices
> Antitrust Litigation, 407 F. Supp. 254, 256 (J.P.M.L.
> 1976).  The transferee judge's notice of suggestion
> of remand to the Panel is obviously an indication that
> he perceives his role under Section 1407 to have ended.
> In re Air Crash Disaster Near Dayton, Ohio, on March 9,
> 1967, 386 F. Supp. 908, 909 (J.P.M.L. 1975).  Absent
> a notice of suggestion of remand from the transferee
> judge to the Panel, any party advocating remand before
> the Panel bears a strong burden of persuasion.  We
> rule that movants have not met this burden here and
> that the motion for remand is premature.  [The transferee
> judge] has become thoroughly familiar with the issues
> in this entire litigation and is in the best position
> to determine the future course of [each action in this
> docket].
>
> Plaintiffs' apparent dissatisfaction with some
> of [the transferee judge's] pretrial rulings is clearly
> not a factor to be taken into consideration by the
> Panel in exercising its discretion under Section 1407.
> The Panel has neither the statutory authority nor the
> inclination to review decisions of district courts,
> whether they are transferor or transferee courts.
> See In re Molinaro/Catanzaro Patent Litigation, 402
> F. Supp. 1404, 1406 (J.P.M.L. 1975); In re Glenn W.
> Turner Enterprises Litigation, 368 F. Supp. 805, 806
> (J.P.M.L. 1973).

In re Holiday Magic Securities and Antitrust Litigation,

433 F. Supp. 1125, 1126 (J.P.M.L. 1977).  We emphasize that

if and when any action or claim in this docket is, in fact,

ready for trial or otherwise ready for remand because the

transferee judge finds that Section 1407 proceedings pertaining

to that action or claim are completed, the transferee judge

may suggest to the Panel that the Panel remand the action

or claim to its transferor court.  28 U.S.C. §1407(a); Rule

11(c)(ii), R.P.J.P.M.L., 78 F.R.D. 561, 569 (1978).  See,

e.g., In re A. H. Robins Co., Inc. "Dalkon Shield" IUD Products

<u>Liability Litigation</u>, 453 F. Supp. 108 (J.P.M.L. 1978).

B. <u>Data National</u>

Data General asserts that <u>Data National</u> primarily involves claims for breach of contract and does not share sufficient questions of fact with the actions in the transferee district to warrant transfer. Furthermore, Data General contends, the antitrust claims in <u>Data National</u> are unrelated to the antitrust claims in the transferee district because in none of the actions in the transferee district is a non-Data General party a purchaser of Data General products under an OEM contract. Data General urges that the actions in the transferee district involve allegedly anti-competitive practices in sales to ultimate users of computer equipment, whereas <u>Data National</u> involves alleged restraints and price discrimination in Data General's distribution system to OEMs. Accordingly, Data General stresses that while the claims in <u>Data National</u> and the actions in the transferee district may be based on violations of the antitrust laws, the factual issues are dissimilar and would not benefit from Section 1407 proceedings. Data General also contends that transfer of <u>Data National</u> should be denied because a proper interpretation of Massachusetts contract law is essential to resolution of the antitrust claims in <u>Data National</u>, and this can best be accomplished by a Massachusetts federal judge familiar with Massachusetts law. Finally, Data General notes that a motion to dismiss Data General's fraud claims in <u>Data National</u> is pending in the Massachusetts court, and Data General therefore suggests that transfer of <u>Data National</u> would be inappropriate prior to resolution of that motion.

We find that <u>Data National</u> should also be included in the centralized proceedings before Judge Orrick. We are persuaded that in both the actions in the transferee district and in <u>Data National</u> substantial overlapping discovery will be required regarding Data General's marketing practices, Data General's economic power, computer technology, and the computer market in general. This commonality is underscored by Data National's assertion that Data General's illegal practices in the OEM market have enabled Data General to exercise its monopoly power in the Enduser market. Transfer of Data National is therefore necessary in order to avoid duplicative discovery and prevent waste of resources by the parties, their counsel and the courts.

We see no reason to delay transfer because of the pendency of a motion to dismiss in <u>Data National</u>. This motion can be presented to and decided by the transferee judge following transfer. <u>See</u> <u>In re Commonwealth Oil/Tesoro Petroleum Securities Litigation</u>, 458 F. Supp. 225, 230 (J.P.M.L. 1978). The fact that the transferee court may have occasion to apply Massachusetts law also serves as no impediment to transfer of <u>Data National</u>. As we stated in <u>In re Air Crash Disaster at John F. Kennedy International Airport on June 24, 1975</u>, 407 F. Supp. 244 (J.P.M.L. 1976):

> [I]t is within the very nature of coordinated
> or consolidated pretrial proceedings in multidistrict
> litigation for the transferee judge to be called upon
> to apply the law of more than one state. <u>See, e.g.</u>,
> <u>In re Air Crash Disaster at Boston, Massachusetts,
> on July 31, 1973</u>, 399 F. Supp. 1106 (D.Mass. 1975).
> Thus, [all parties] can be assured that [the law of
> the transferor district], as well as any other state's
> law, if appropriate, will be duly applied by the trans-
> feree judge.

Id. at 246-47.

IT IS THEREFORE ORDERED that, pursuant to 28 U.S.C. §1407, the actions entitled Data General Corporation v. Data National Corporation, D. Massachusetts, C.A. No. 78-2869-K, Data General Corporation v. Ampex Corporation, et al., D. Massachusetts, C.A. No. 79-193-T, and Ampex Corporation, et al. v. Data General Corporation, et al., C.D. California, C.A. No. CV79-1342-MRP, be, and the same hereby are, transferred to the Northern District of California and, with the consent of that court, assigned to the Honorable William H. Orrick, Jr., for inclusion in the coordinated or consolidated pretrial proceedings occurring there.

IT IS FURTHER ORDERED that the motion pursuant to 28 U.S.C. §1407(a) for remand of the action entitled Data General Corporation v. Ampex Corporation, N.D. California, C.A. No. C79-1002-WHO (D. New Jersey, C.A. No. 77-0036), be, and the same hereby is, DENIED.